**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————————————

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 7** |
| **STAGE PRESENCE, INC.,** | : | |
| | : | **Case No. 12-10525 (MEW)** |
| Debtor. | : | |
| ——————————————————————: | : | |
| | : | |
| **MUSIC MIX MOBILE LLE,** *et al.,* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Adv. Pro. No. 15-1392 (MEW)** |
| | : | |
| **ALLEN NEWMAN,** | : | |
| | : | |
| Defendant. | : | |
| ——————————————————————: | : | |


### BENCH DECISION AFTER TRIAL REGARDING ALTER EGO CLAIMS


APPEARANCES:

CONNOLLY LAW
*Attorneys for the Plaintiffs*
One Battery Park Place
New York, New York
    By: Kerry E. Connolly, Esq.

JOHN CARLSON
*Attorney for Allen Newman*
5 Winifred Drive
Winnick, New York
    By: John Carlson, Esq.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

    This is the final version of a bench decision that was read into the record on October 24,

2018.  It contains my rulings and findings following a trial in the adversary proceeding

commenced by Music Mix Mobile, LLC and nine other plaintiffs, which is adversary proceeding

number 15-01392.

## **Background**

This proceeding was filed in connection with the bankruptcy case of Stage Presence, Inc.

The claims arise out of a televised benefit concert in Washington, D.C. that was held on April

13, 2010 for the benefit of a charity known as Childhelp, Inc.   Plaintiffs provided services in

connection with that concert for which they claim they were not paid.

The named defendants originally included Stage Presence; plus three individuals named

Allen Newman, Matthew Weiner and Gregory Marquette; plus an entity named One for Each

Island Ltd.   Stage Presence is the entity that hired plaintiffs to provide services in connection

with the Childhelp concert.   Mr. Newman is the sole owner of Stage Presence.   Mr. Newman,

Mr. Weiner and Mr. Marquette were producers of the benefit concert (the "Producers").   One

for Each Island was the entity that contracted with Childhelp to put the benefit concert together.

However, the parties agreed at trial that the formation of One for Each Island, though

contemplated at one time, never actually was completed.   As a result, the entity has never

existed.   As a non-existent entity it cannot be and is not a party to these proceedings.

Stage Presence does not dispute that it owes money to the plaintiffs, and its trustee did

not participate in the trial.   As the result of prior motions I dismissed all of the claims against

Mr. Weiner and Mr. Marquette, and all but one of the claims against Mr. Newman.   The only

remaining claim against Mr. Newman is the plaintiffs' claim that Mr. Newman should be held

liable for the debts owed by Stage Presence based on "alter ego" or "piercing the corporate veil"

theories.   These contentions were the subject of a trial that was conducted on October 11 and 12,

2018.

## Jurisdiction and Power to Render a Final Decision

At an earlier stage of these proceedings the parties agreed that all of the relevant claims were at least "related to" the Stage Presence bankruptcy case, and the parties consented to a final determination of all claims by this Court.   *See* Statement Consenting to Jurisdiction, Docket No. 39; Statement Consenting to Jurisdiction, Docket No. 40; Statement Regarding Consent to Entry of Orders or Judgment in Core Proceeding, Docket No. 41; Statement Regarding the Ct's Jurisdiction, Docket No. 43.   Mr. Newman nevertheless argued at a later time, when summary judgment motions were filed, that this court lacked jurisdiction.   It is plain, though, that the claims asserted here are "related to" the Stage Presence bankruptcy and to the claims asserted in the Stage Presence bankruptcy case.

As I will explain in a few moments, the New York courts have held that the "alter ego" theories that are being pursued here are not independent causes of action, but instead are remedies that may be pursued against a company's owners (or perhaps other people) in the collection of debts owed by a company.   In that respect Mr. Newman's alleged liability depends entirely on the existence of a liability owed by Stage Presence itself.   There is no allegation here that Mr. Newman personally guaranteed any of Stage Presence's obligations, or that plaintiffs contracted with Mr. Newman personally.

In addition, it is well-settled that "a civil proceeding is related to a title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate." *Residential Funding Co., LLC v. UBS Real Estate Secs. Inc. (In re Residential Capital, LLC)*, 515 B.R. 52, 63 n.12 (Bankr. S.D.N.Y. 2014) (citing *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011)).   Here, of course, if Mr. Newman were to be held liable, and if he were to satisfy the underlying debts, that would directly affect the bankruptcy estate, as the

payments by Mr. Newman would satisfy the obligations and cancel the debts.   I therefore hold, just as the parties initially conceded, that there is subject matter jurisdiction over this proceeding.

I also hold that I have the power to make a final determination by virtue of the express written consents that the parties originally filed.   A consent to a final determination by the bankruptcy court may not be withdrawn except upon a showing of good cause.   *See Capuccio v. Capuccio (In re Capuccio)*, 558 B.R. 461, 464-65 (Bankr. W.D. Okla. 2016), and cases cited therein.   Here, the consents that were filed expressly committed the parties' disputes to final resolution by the bankruptcy court.   This court then proceeded to make final rulings as to a number of claims and a number of parties, including as to certain of the claims against Mr. Newman.   I denied the motion to dismiss as to the *alter ego* claims, and the parties then completed their discovery.   It was only at the time that trial approached, and during summary judgment arguments, that Mr. Newman suddenly objected to a final decision in this court.

It would not have been just to allow Mr. Newman to revoke his prior consent, at a late stage in the case and after other final rulings had been made on other claims, just because Mr. Newman had second thoughts as to where and when he would like the remaining claim to be decided.   Consents to final determinations by this Court would be rendered meaningless if they could be withdrawn because a party does not like the way a litigation is progressing, or because the party's tactical judgments have changed, or because the party has changed its mind.   "Good cause" to revoke a consent requires something much more than a mere change of heart, and that is all that we had in this case.

### The Evidence at Trial

The parties offered the live testimony of three witnesses.   The first witness was Mitch Maketansky of Music Mix Mobile, which is one of the plaintiffs.   The second witness was Alan

4

Kelman, who was employed by Stage Presence to help organize the production of the benefit

concert and who arranged for other plaintiffs to provide services.   The third witness was Mr.

Newman himself.   I also received a number of exhibits in evidence, including some portions of

prior deposition testimony.

I have listened carefully to the testimony, and reviewed all of the exhibits in evidence, in

making the decisions I am announcing today.   I want to make clear that while the three

witnesses who appeared at trial certainly have different outlooks on the underlying events, and

while the outcome of the trial can only favor one side and not the other, I nevertheless believe

that each witness testified honestly as to what he recalls and what he believes about the

underlying circumstances, without attempting to be evasive or misleading.   I commend the

witnesses for that, and I appreciate how they conducted themselves.

I also want to make clear that counsel made well-organized presentations, and that my

decision today is based on the merits of the evidence that I have heard and on the requirements of

the applicable law, and it is not in any way to be taken as a comment on the performance of the

attorneys.

For the reasons I will explain, I have decided that plaintiffs have failed to prove their

claims, and that Mr. Newman is not personally liable for the debts that Stage Presence owes to

the plaintiffs.

## **Applicable Law**

Before discussing the evidence I will first review the elements of the plaintiffs' claim.

The first step is to identify the law that is applicable to this proceeding.

Stage Presence is a New York corporation.   However, the benefit concert took place in

Washington, D.C.   I have previously held that at least some of the original claims that were

5

asserted (namely, statutory claims by employees for failure to pay wages) were governed by the laws of the District of Columbia, because that is where the employees provided their services.

The claims before me now are based on Stage Presence's failure to meet contractual obligations.   The contracts at issue, pursuant to which plaintiffs agreed to provide services to Stage Presence, apparently were not in writing.   There was no evidence at trial that would allow me to determine whether the contracts were made in New York or elsewhere.

Nevertheless, in their prior submissions the parties have relied entirely on New York law in discussing the issues that are to be decided here.   *See, e.g.*, Pls.' Mem. of Law in Support of Pls.' Mot. for Summ. J., Docket No. 86; *see also* Def's Mem. of Law in Support of Def's Mot. for Summ. J., Docket No. 89-4.   Since the parties agree on the application of New York law, I will apply New York law in making my rulings.

## Plaintiffs' Right to Pursue Alter Ego Remedies

The theories on which a corporation's owner may be held liable for the corporation's debts are sometimes referred to as "alter ego" theories or as "piercing the corporate veil" theories.   There is some disagreement among courts as to whether these actually are two distinct theories.   *See, e.g.*, *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000).   In *Sheet Metal Workers' National Pension Fund*, the Seventh Circuit Court of Appeals held that "alter ego" theories are premised on direct liability, whereas "veil piercing" theories are equitable in nature and are a form of vicarious liability.   *Id.* More particularly, the "alter ego" theory is that the corporation has no real separate existence and therefore that the corporation and its owner are one and the same person.   On the other hand, the "veil piercing" theory is that an owner abused the corporate form to accomplish some kind of

fraud or injustice, in which case equity will look past the corporate form, and will disregard it, to prevent the fraud or injustice from being accomplished.

However, under New York law "alter ego" and "veil piercing" theories are really the same.   The federal courts have long held that under New York law, the concepts of alter ego liability and veil-piercing liability "are indistinguishable, do not lead to different results, and should be treated as interchangeable."   *See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991); *see also MWH Int'l, Inc. v. Inversora Murten, S.A.*, No. 11-cv-2444, 2015 U.S. Dist. LEXIS 24129 at *35-36 (S.D.N.Y. Feb. 11, 2015).   The *Passalacqua* decision was entered in 1991, but more recent decisions by the New York Court of Appeals have continued to treat the alter ego and veil piercing theories as being subject to the same substantive requirements.   *See, e.g.*, *Cortlandt St. Recovery Corp. v. Bonderman*, 96 N.E.3d 191, 203-05 (N.Y. 2018); *TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749, 751 (N.Y. 1998).

Having determined that under New York law there is no difference between the "alter ego" and "veil piercing" contentions, the next issue to consider is whether the plaintiffs have the right to pursue those contentions.

An issue that frequently arises in bankruptcy cases is whether "alter ego" claims belong to creditors or instead belong solely to the bankruptcy estate.   In this case, for example, Mr. Newman sought summary judgment after the conversion of the Stage Presence case to chapter 7, on the theory that only the chapter 7 trustee could pursue an alter ego claim and that the chapter 7 trustee had elected not to do so.   Courts that have considered this issue have discussed whether the "alter ego claim" is one that is "particularized" to an individual creditor, or whether instead the claim is of general applicability, such that all creditors would be affected the same way if the

7

claim were to succeed.  *See, e.g.*, *JMK Const. Group, Ltd. v. Queens Borough Pub. Library (In re JMK Const. Group, Ltd.)*, 502 B.R. 396, 405 (Bankr. S.D.N.Y. 2013), and cases cited therein. On this theory, the Second Circuit Court of Appeals recently rejected an effort by personal injury claimants to assert alter ego liability against Kerr-McGee based on actions by a former subsidiary.  *See Tronox Worldwide LLC v. Kerr-McGee Corp. (In re Tronox Inc.)*, 855 F.3d 84 (2d Cir. 2017).   In *Tronox*, the Second Circuit held that the alleged liability of Kerr-McGee did not arise from its own conduct, but instead from its alleged status as an alter ego (or more precisely as an alleged corporate successor to an alleged corporate alter ego).  *Id.* at 105.   The Court ruled that any harm that was alleged would have been generally applicable to all Tronox creditors, and that as a result only the bankruptcy trustee could pursue the claim.  *Id.* at 100, 107.

It is important to note that in *Tronox* the alter ego claims were not governed by New York law, but the test affirmed by *Tronox* is the same test that has been used by other courts in deciding whether claims under New York law belong to the trustee or to individual creditors.

Obviously I am bound by the Second Circuit's decision in *Tronox*.   However, to be candid I personally have difficulty reconciling the standard that was used in the *Tronox* decision, and that has been applied in other decisions, with two other relevant lines of authority.

First, the New York Court of Appeals has made clear that under New York law an "alter ego" or "veil piercing" argument is not a separate, stand-alone cause of action.  *See Matter of Morris v. New York State Dept. of Taxation & Fin.*, 623 N.E.2d 1157, 1160-61 (N.Y. 1993). Instead, piercing the corporate veil, or awarding alter ego relief, is a remedy that a plaintiff may pursue to collect a claim against a company.  *Id.*   The Second Circuit Court of Appeals has recognized and enforced this holding, as have the district courts in this district.  *See, e.g.*,

8

*Cordius Trust v. Kummerfeld*, 153 Fed. Appx. 761, 762-63 (2d Cir. 2005) (holding that a veil-piercing claim is not a separate cause of action independent of the underlying claim against the corporation); *see also Network Enters., Inc. v. Reality Racing, Inc.*, No. 09 Civ. 4664, 2010 WL 3529237 at *4 (S.D.N.Y. Aug. 24, 2010).

Treating alter ego and veil piercing theories purely as remedies, however, seems inconsistent with the case law that addresses the issue of whether an alter ego "claim" belongs to individual creditors as opposed to a bankruptcy trustee.   Those cases effectively treat alter ego arguments as "claims," and even tend to use that language in deciding who owns and may assert the "claims."   If "alter ego" theories and "veil piercing" theories are not separate claims at all, and instead are just remedies for other claims, then it is difficult to see how they could belong exclusively to a bankruptcy estate.   I understand the theory under which a "claim" may belong to an estate.   But I know of no theory under which a "remedy" belongs exclusively to an estate, even when the estate does not own the claim to which the remedy is relevant.   So long as the underlying creditor claim belongs to an individual creditor, it is hard to understand why an alter ego "remedy" would not also belong to that creditor.

A distinction might make sense in this regard if New York courts treated alter ego claims differently from veil piercing claims, as the Seventh Circuit does.   *Sheet Metal Workers' Nat. Pension Fund*, 212 F.3d at 1038.   Perhaps in that context an "alter ego" claim – one that treats an owner as the same person as the corporation – might be the equivalent of a claim with "generalized" effect, whereas a "veil piercing" claim would depend on the equities of individual cases and might more likely just be a "remedy" belonging to individual creditors.   But the New York decisions do not recognize such a distinction, leading to the problems that I have described above.

Second, the *Tronox* decision and other cases not only discuss alter ego arguments as though they are claims, but also seem to presume that a trustee has clear authority to pursue such claims whenever the claims would have a "generalized" effect on all creditors.   This approach, however, seems inconsistent with the Second Circuit's decision in *Picard v. JP Morgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013), where the court held that a trustee does not generally have a right to assert claims that creditors could have asserted, even if they are claims that would affect all creditors or that would benefit all creditors in the same manner.

*Picard* involved the case of Bernard L. Madoff Investment Securities (otherwise known as "BLMIS"), which is a case under the Securities Investor Protection Act and not the Bankruptcy Code.   But the Second Circuit noted in its decision that the Securities Investor Protection Act gives a trustee essentially the same power as the Bankruptcy Code would provide, and in making its decision the Court relied heavily on its finding that the same rules would apply in the BLMIS case as would apply in a bankruptcy case.   *Id*. at 58, 74-75.

The trustee for BLMIS sought to pursue claims against financial institutions that allegedly had aided and abetted Bernard Madoff in the commission of his fraud.   The trustee argued that the defendants' wrongful acts had affected all creditors generally and that the trustee therefore should be able to pursue the claims.   However, the Court of Appeals rejected the notion that the "common" or "general" nature of a trustee's claim was enough to confer standing. The Court noted that the trustee's argument would be inconsistent with prior decisions that confirmed that trustees may not bring claims on behalf of creditors.   *Id*. at 58 (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 1144 (2d Cir. 1991)).

The BLMIS Trustee argued to the Second Circuit that the Court's own prior decision in *St. Paul Fire & Marine Insurance Co. v. PepsiCo*, 884 F.2d 688 (2d Cir. 1989), stood for the proposition that the trustee may assert an alter ego claim that would benefit all creditors generally.   *Picard*, 721 F.3d at 70.   Indeed, that is how many courts have interpreted and applied the *St. Paul* decision.   But the Court of Appeals rejected this argument in *Picard*.   It held that the decision in *St. Paul* only resolved the "specific question" of whether a creditor could bring an alter ego claim against the debtor's parent when the debtor itself also possessed and had the right to pursue such a claim under state law.   *Id.*   The Court of Appeals concluded in *Picard* that the *St. Paul* decision does not define *whether* claims belong to an estate in the first place.   *Id.*   Instead, *St. Paul* was just a ruling that if claims *do* belong to the bankruptcy estate, then only the trustee, and not creditors, may assert the claims.   *Id.*

Under the *Picard* decision, the mere existence of a "general" effect on creditors would not be enough to give a trustee standing to pursue an "alter ego" claim, even if the alter ego theory were a separate "claim."   Instead, one would need to consider whether the trustee has been given that right, either because of powers granted by the Bankruptcy Code or because of rights inherited from the corporation itself.   Unfortunately this leads me to another area of the case law where some of the older holdings seem to be at odds with more recent authority.   There are many cases in which courts have held that a bankruptcy trustee is entitled to assert "alter ego" claims under New York law.   But in many respects these rulings seem inconsistent with the *Picard* decision.

For example, in *In re Keene Corp.*, 164 B.R. 844, 851 (Bankr. S.D.N.Y. 1994), the court held that under New York law a "trustee" has standing to assert alter ego claims and that creditors are precluded from doing so unless the claims have been abandoned.   The *Keene*

decision cited three prior federal court decisions in support of that holding: *Gosconcert Hillyer*, 158 B.R. 24, 28 (S.D.N.Y. 1993); *Goldhaber v. Tri-Equities, Inc.*, 112 B.R. 593, 596 (Bankr. S.D.N.Y. 1990); and *Green v. Bate Records, Inc. (In re 10th Ave. Record Distribs.)*, 97 B.R. 163, 166 (S.D.N.Y. 1989).   *Gosconcert* also cited only to other federal decisions; in fact, the real claim in *Gosconcert* was that a third party had taken assets that belonged to the debtor, and that claim clearly was properly asserted by the trustee, not by someone else.   *Goldhaber* held that under New York law, a trustee may bring "an alter ego cause of action" on behalf of a debtor in order to collect property for the benefit of other creditors, but in support of that proposition it relied on the decision in *In re 10th Ave. Record Distributors*.   In *In re 10th Ave. Record Distributors*, however, the court just held that, by analogy to fraudulent transfer claims and other rights, a trustee has authority to pursue an alter ego claim if doing so would benefit all creditors generally.   *Id*. at 167.   As noted above, that is inconsistent with the more recent *Picard* decision, as well as with the notion that alter ego theories are remedies, not claims.

*Mannuccio v. Cabrini Medical Center (In re Cabrini Medical Center)*, 489 B.R. 7, 16 n.73 (S.D.N.Y. 2012), is another decision that holds that a trustee may assert alter ego claims. In support of that proposition the *Cabrini* decision cited to *Gruber v. Victor*, No. 95 Civ. 2285, 1996 WL 492991, at *10 (S.D.N.Y. Aug. 28, 1996), which in turn cited to the state court decision in *Corcoran v. Hall*, 149 A.D.2d 165 (1st Dept. 1989).   But in the *Corcoran* decision, the court merely cited to prior federal court decisions for the proposition that as a matter of federal bankruptcy law, a trustee may assert any claim that would benefit all creditors.   More recently, the *Picard* decision holds that a "general[ized]" effect is not enough, and that a trustee can only pursue claims that it has authority to pursue under the Bankruptcy Code or that the debtor itself could have pursued.   721 F.3d at 70-71.   The New York court's decision in

*Corcoran* cannot be relied upon as authority for the proposition that under New York state law a

trustee may pursue an alter ego theory, because *Corcoran* relied entirely on prior federal

authority (not on New York law), and the prior federal authority on which *Corcoran* relied does

not appear to be valid after the *Picard* decision.

These are important issues that ought to be clarified and that I am confident will be

clarified in future decisions.   Fortunately, I do not need to resolve them in this particular case.   I

have previously held that the plaintiffs' theory in this case was particular to them, and did not

constitute a claim that belonged to the trustee.

As set forth in the pretrial order, plaintiffs argue that Mr. Newman was the sole owner

and had complete control of Stage Presence, and that in connection with the Childhelp benefit

concert he allegedly used Stage Presence to incur liabilities in connection with Mr. Newman's

personal business.   More particularly, they allege that Mr. Newman caused Stage Presence to

acquire services and goods from the plaintiffs for use in connection with a program for which

Mr. Newman and others were Producers and for which Stage Presence itself had no contractual

role.   They further argue that Mr. Newman knew that the Producers did not, or might not, have

the necessary financing for the benefit program, and that using Stage Presence to hire workers

and vendors was an improper and inequitable use of the corporation to shift the risk of non-

funding from the Producers to the creditors of Stage Presence.   They argue that this constituted

an injustice as well as a fraud in connection with the Childhelp benefit, on the theory that Mr.

Newman allegedly misrepresented the funding risks to Plaintiffs.   Finally, plaintiffs argue that

corporate formalities were not observed and that the separate existence of Stage Presence was

not respected vis-à-vis Mr. Newman and vis-à-vis other entities in which Mr. Newman had

ownership interests.    On those grounds plaintiffs contend that Mr. Newman personally should be held liable for the unpaid debts that Stage Presence owes to the plaintiffs.

The claims that plaintiffs have made are particular to the Childhelp concert.    Plaintiffs do not allege that each and every obligation that Stage Presence ever incurred was fraudulent or was incurred with an unjust purpose.    Their claims, if found to have merit, would benefit only those creditors who have asserted claims in connection with the Childhelp benefit program.    Other potential creditors – such as tax creditors, for example, or anyone who might have a claim relating to a prior show – would receive no benefit from such rulings.

Accordingly, no matter how I view the underlying claims or remedies, and no matter how I view the potential problems under the case law that I have described above, it seems clear to me that the claims being asserted here are particularized to the plaintiffs and do not belong to the chapter 7 trustee.

Having made those preliminary comments, I will now turn to the elements of the alter ego contentions and the evidence at trial.

### Evaluation of Plaintiffs' Alter Ego Contentions

Under New York law, the separate existence and status of a corporation is not lightly disregarded.    *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979).    As the New York Court of Appeals held in *Matter of Morris v. New York State Department of Taxation & Finance*, 623 N.E.2d 1157, 1160 (N.Y. 1993), in the ordinary case "it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners."    In fact, the very nature and purpose of conducting business through a corporation is to shield the owners from direct liability for the debts incurred in connection with that business.    Accordingly, an owner ordinarily is not liable for the debts incurred by a corporation.

14

Plaintiffs may pierce the corporate veil, and impose liability on an owner, where the evidence shows that the owner exercised complete domination over the corporation with respect to the transaction at issue such that the corporation had no separate identity, and that such domination was used to commit a fraud or a wrong against the plaintiffs that resulted in injury to the plaintiffs.  *See Matter of Morris,* 623 N.E.2d at 1160-61.   In *Morris* the court made clear that while complete domination of a corporation is required in order to pierce the corporate veil, it is not enough by itself.   Instead, "some showing of a wrongful or unjust act toward plaintiff is required."   *Id.* at 1161.

Prior decisions have identified a number of non-exclusive factors that may be considered in deciding whether a corporation has been completely dominated by its owner to the point where the corporation has no separate identity.   Many of the factors listed in prior cases are phrased in terms that assume that one corporation is owned by another, and so I have paraphrased the factors here.   They include:

- The absence of the formalities that are part of corporate existence (for example, the issuance of stock, election of directors, and keeping of corporate records);

- Inadequate capitalization;

- Whether funds are put in and taken out of the corporation for personal rather than corporate purposes;

- Overlaps in ownership, officers, directors and personnel;

- Common office space, address and telephone numbers;

- The amount of business discretion displayed by the allegedly dominated corporation;

- Whether the related corporation dealt with its owner or other related corporations at arm's-length;

15

- Whether the corporation was treated as an independent profit center;

- The payment or guarantee of debts by the dominated corporation in favor of its owner or other related corporations; and

- Whether the corporation in question had property that was used by the owner just as though it belonged to the owner.

*See Wm. Passalacqua Builders,* 933 F.2d at 139.

While these are factors that may be considered, however, they cannot be applied in a vacuum, and the court must conduct a broad-based inquiry into the totality of the facts to determine if the party seeking to pierce the corporate veil has established an improper domination of the corporation. *Id.*; *see also American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988); *Ng v. Adler (In re Adler)*, 467 B.R. 279, 286-87 (Bankr. E.D.N.Y. 2012). The New York Court of Appeals made clear in *Morris* that the decision whether to pierce the corporate veil must be based on the "attendant facts and equities" of each separate case, and cannot be reduced to a set of formulas and factors with pre-determined weights. *See Matter of Morris,* 623 N.E.2d at 1160-61.

The uncontradicted evidence at trial showed that Stage Presence was incorporated in 1985. It originally had two owners, but has been owned only by Mr. Newman since approximately 1987 or 1988. It has acted as a "below-the-line" contractor to arrange crew and equipment for various productions. It has not always had its own offices, but during many years it did have its own offices.

Stage Presence may have had more than one director at the time of its formation, but for some time Mr. Newman has been the sole director and the sole employee. No formal director meetings have been held for some time, and no formal shareholder meetings have been held for

some time.   However, Stage Presence has always retained counsel to provide legal advice, and accountants to assist with bookkeeping and financial questions.   The accountants may also at some point have served as treasurers of Stage Presence, though on this particular point the testimony was not clear.

Stage Presence filed all of its required tax returns and maintained its corporate franchise. It kept its own separate books and records with the assistance of outside accountants.   The outside accountants prepared annual financial statements for Stage Presence.   Stage Presence always had bank accounts, and they were always separate from Mr. Newman's accounts.   Stage Presence did not commingle funds with Mr. Newman.   It did not pay personal expenses on behalf of Mr. Newman.   It made some distributions to Mr. Newman, just as any corporation does if it has excess funds, but it did so only after a review by the outside accountants and a determination of what funds could safely be distributed in light of upcoming potential cash needs.

Stage Presence obtained funding for its projects from some combination of retained cash or payments by advertising agencies, sponsors or other persons.   It always contracted in its own name.   Stage Presence hired payroll processing firms to handle payments to employees in connection with individual jobs.   It also purchased insurance in its own name and for its own account.   All licenses and permits needed for productions were obtained in the name of Stage Presence itself.

On the whole I do not find that this is evidence that is sufficient to support the kind of "domination" that is envisioned by the New York courts before a corporate veil can be pierced. From a financial, business and operating perspective the evidence shows that the separate corporate existence of Stage Presence was scrupulously guarded and observed.   Similarly, the

evidence shows that the assets and liabilities of Stage Presence were never commingled with those of Mr. Newman.

It is true that Stage Presence did what Mr. Newman told it to do. But corporations always do what their owners tell them to do, or at least they should do so. In fact, many courts have held that it is the duty of a corporation to further the interests and wishes of its owners. *See, e.g.*, *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Chancery 2006) (holding that a parent corporation had the right to cause its subsidiary to incur debts to support the parent's business because "[w]holly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created") If the fact that a corporation served its owner's interests were enough to establish a wrongful "domination" of the corporation, then the corporate form would never be respected.

Plaintiffs have offered into evidence a finding in a prior District Court litigation against Mr. Newman and Stage Presence holding that "[t]he corporation does not observe the corporate formalities." But no further specifics were set forth in those findings as to which formalities had not been observed, and in which respects. It was admitted during the trial in this case that Stage Presence had only one director during the relevant time, did not hold directors' or shareholders' meetings and therefore did not have minutes of such meetings, had only one employee, and had only one decision maker (namely, Mr. Newman). But "in the case of closely-held corporations these facts are not uncommon," and usually they should be treated as merely "neutral" considerations in determining whether to pierce the veil of a closely-held corporation. *See In re Adler*, 467 B.R. at 291; *see also Cardell Fin. Corp. v. Suchodolski Assocs. Inc.,* No. 09 Civ. 6148, 2012 WL 12932049, at *25 (S.D.N.Y. July 17, 2017) (noting that overlaps in an owner's roles are "common-place among closely-held corporations of this type and thus do[] not weigh

significantly in favor of a finding of domination and control" for purposes of alter ego analysis); *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989) (noting that in small privately held corporations "the trappings of sophisticated corporate life are rarely present" and warning that courts should be careful about the weight to be given to this factor if in other respects the separate corporate existence was honored).

I find that, in this case, the absence of other directors, or of regular directors' meetings, or of directors' minutes, is a sign of sloppiness, rather than an indication that the separate existence of Stage Presence was or should be ignored.   As I have noted, the evidence showed that in all important operational and financial respects the separate existence of Stage Presence was honored and fully respected.   *See, e.g.*, *Krause v. Eihab Human Servs.*, No. 10 CV 898, 2015 U.S. Dist. LEXIS 101820 at *45 (E.D.N.Y. Aug. 4, 2015) (noting that the corporation in that case "lacked a level of professional polish that would be desired from a well-run organization" but that on the whole the evidence fell short of showing that the corporation was so dominated that it "had no existence of its own"); *Tycoons Worldwide Group (Thailand) Pub. Co., Ltd. v. JBL Supply Inc.*, 721 F.Supp. 2d 194, 206 (S.D.N.Y. 2010) (disregarding a failure to observe corporate formalities where adequate books and records were kept, corporate funds were not commingled with funds of the owner, the owner did not siphon off corporate funds for personal use, and the evidence did not support a conclusion that the corporation was just a "dummy" for the individual owner).

Furthermore, the fact that Mr. Newman was the only director and the only employee is not an unusual feature of small, closely-held corporations and is not an adequate reason to disregard the separate existence of the corporation.   In fact, even among large corporate families

a complete overlap of officers and directors does not justify piercing the corporate veil.

*American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).

Plaintiffs have offered into evidence a finding in the same prior District Court litigation

to the effect that Stage Presence "is undercapitalized and has failed to pay wages and other debts

that have been due and owing since April 13, 2010."   However, this finding just suggests that at

the time of the District Court litigation Stage Presence did not have enough money to pay its

debts.   The record at the trial before me shows that Stage Presence operated for more than 25

years and paid all its debts with the exception of those incurred in connection with the Childhelp

benefit.   It is certainly true that Stage Presence did not have enough resources on its own to pay

those obligations, but as I will explain in a moment that is entirely due to the fact that other

parties defaulted on their promises to provide such funding.

Undercapitalization alone generally is insufficient to warrant piercing of the corporate

veil.  *Tycoons Worldwide Group (Thailand) Pub. Co. v. JBL Supply Inc.*, 721 F.Supp. 2d 194,

206-07 (S.D.N.Y. 2010); *McDarren v. Marvel Entertainment Group*, No. 94 Civ. 0910, 1995

U.S. Dist. LEXIS 4649 at *9 (S.D.N.Y. Apr. 11, 1995) (holding that "under New York law,

undercapitalization alone is insufficient to pierce the corporate veil"); *see also Gartner v. Snyder*,

607 F.2d 582, 588 (2d Cir. 1979).   This is particularly true where, as here, the corporation is

adequately capitalized at its outset and runs successfully as a business enterprise for many years,

only to ultimately find itself in financial trouble, and where the other evidence compels the

conclusion that the separate identity of the corporation was respected.   If the corporate form

were to be disregarded whenever a corporation could not pay its debts, then the corporate form

would never be respected in a bankruptcy case.   The relevant question is whether a

corporation's separate existence was respected.   There are cases in which a failure to capitalize a

company (particularly at the outset of its business) may suggest an intent to ignore the company's separate existence, but as I will explain in a moment the financial troubles that occurred here are the result of a breach of a loan agreement, not a disregard of corporate form.

I note that while the District Court made the general factual findings described above concerning the observation of "corporate formalities" and the "undercapitalized" state of Stage Presence after April 2010, the District Court also held in a later decision in that same prior case that other factors had to be considered in deciding whether the corporate veil would be pierced, and it denied requests for the entry of summary judgment on those issues. This ruling further made clear that the limited findings that were cited were not sufficient, by themselves, to justify piercing the corporate veil.

I find based on all the evidence that the separate corporate existence of Stage Presence was honored and recognized and that there was an absence of the type of domination and disregard of corporate form that would be needed to sustain the remedy of piercing the corporate veil. I also find that there is nothing in the evidence that supports the contention that the separate corporate existence of Stage Presence was used to perpetrate a fraud or an injustice in dealings with the plaintiffs.

Plaintiffs have argued that since Mr. Newman and others were the Producers for the Childhelp program it was wrongful of them to use Stage Presence to hire workers and production crews and vendors to assist in the production. However, there is nothing about Mr. Newman's designation as the "Producer" of the program, in contracts with Childhelp, that required him personally to employ laborers, camera crews and other support providers. There is absolutely no reason why Mr. Newman was not permitted to use somebody else, including Stage Presence, as the contracting entity. This was the role that Stage Presence had played in many prior

productions, and the business role that it was well suited to play in connection with the Childhelp

benefit concert.

The mere fact that Mr. Newman employed Stage Presence as the contracting entity was

not itself in any way an abuse of the privilege of doing business in the corporate form.    That is

the whole reason why Stage Presence existed, and it was a legitimate reason.    *See, e.g.*, *Trenga*

*Realty v. Tiseo*, 117 A.D.2d 951, 951-52 (App. Div. 3d Dep't 1986) (holding that "[i]t is widely

held that a corporation may be organized for the very purpose of avoiding personal liability

provided the corporation really exists and is doing business as permitted by law").

Plaintiffs knew and understood that they were entering into contracts with Stage

Presence.    There is no allegation that they ever thought otherwise, and certainly no evidence that

they ever thought otherwise.    They did not ask for a personal guaranty from Mr. Newman, and

there is no evidence that any of them ever expected Mr. Newman personally to pay the amounts

that Stage Presence owed to them.

Plaintiffs argue that the contract with Childhelp was in the name of One for Each Island,

which did not exist.    They also note that the only contract that purported to entitle the Producers

to the payment of fees for their services was the contract with One for Each Island, but that Stage

Presence had allegedly listed those Producer fees as debts in the schedules of liabilities that

Stage Presence filed in its bankruptcy case.    It certainly would have been better if Mr. Newman

had executed contracts with Childhelp that spelled out what Stage Presence's rights and

obligations were in connection with the concert.    But upon consideration of all the evidence I

find that this, too, is an example of sloppiness rather than evidence that the separate corporate

existence of Stage Presence was ignored or that it should be disregarded by me.    This is

particularly true because I also find, as I will explain further below, that Mr. Newman reasonably

22

believed he had arranged funding, in the form of a loan agreement with Stage Presence itself as the named beneficiary, and that would have allowed Stage Presence to pay its obligations if the loan agreement had been honored.

The contracts that are most important here – namely, plaintiffs' own contracts (which admittedly were with Stage Presence) and the contract for the funding of the show – were in the name of Stage Presence.   If Stage Presence has problems making payment, that has nothing to do with the lack of a formal contract between Stage Presence and Childhelp.   The problems are entirely due to the fact that Geneve International Trust did not provide the funding that it promised.   As to the Producers' Fees: whether the lack of documentation affects the Producers' right to fees, and whether it is a reason why the trustee might consider objections to the Producers' claims for fees against Stage Presence, is a separate issue that is not before me today.

Plaintiffs' counsel also elicited testimony to the effect that Mr. Maketansky was not told that the funding was not yet locked in, or that other entities in addition to Stage Presence might be involved in the production.   However, there is no evidence that any of the plaintiffs ever asked, or that plaintiffs were even interested in the financial arrangements.   Instead, the evidence shows that they trusted Stage Presence and Mr. Newman as a result of prior business dealings.   The evidence shows, in short, that plaintiffs believed that if Mr. Newman was confident in the funding, that was good enough for them.   Plaintiffs were understandably disappointed when Stage Presence could not pay them, but that does not mean that Mr. Newman defrauded them or treated them unjustly.

At several other times during the trial plaintiffs' counsel elicited testimony to the effect that Mr. Newman did not tell other people that the financing for the benefit concert was problematic.   Again, however, there is no evidence that plaintiffs ever asked about the

financing, or showed any interest in it.   Furthermore, the evidence actually showed that Mr.

Newman was open in sharing information about the funding arrangements with Mr. Kelman

(who hired the plaintiffs), and that Mr. Newman only proceeded with the concert once he

believed that financing was in place.

More particularly:   One of the original ideas was to try to fund the benefit concert by

arranging sponsors.   However, the uncontradicted evidence at trial was that the sponsorship idea

was abandoned after it became clear that it would not succeed.   In fact, the uncontradicted

evidence is that Mr. Newman sought to cancel, or at least to postpone, the benefit concert once it

became clear that sponsorships could not be counted on to provide funding.   At that time the

representatives of Childhelp suggested that Steven Menner might be able to arrange funding.

Mr. Menner in fact did offer to provide funding.   He offered to do so through an entity called

Geneve International Trust.   Mr. Menner provided evidence of Geneve's financial wherewithal,

introduced Mr. Newman and others to Geneve's counsel (Mr. Bartholomew), and Geneve then

executed a non-recourse loan agreement under which Geneve would provide funding to Stage

Presence.

The evidence shows that Mr. Newman, and Mr. Kelman, did not proceed to hire the

plaintiffs until after having received Geneve's promise to execute a loan agreement in amounts

that plainly were sufficient to pay the expenses of the show.   Plaintiffs contended that Mr.

Kelman was misled, but he was not.   In fact, Mr. Kelman acknowledged that he approved the

hiring of the plaintiffs after seeing the emails as to the promissory note and upcoming loan

agreement to be provided by Geneve, even though he also knew that the funding had not yet

been actually received and that the documentation was not yet in place.

Plaintiffs complained that Mr. Newman allegedly had not shared with them information about the original plans to obtain funding from potential sponsors. However, there is no evidence that they ever asked. Furthermore, as noted above an entirely different funding plan was in place at the time plaintiffs were actually engaged to move forward with the concert.

Plaintiffs also advanced the theory that the proposed funding from Geneve was a sham, and that Newman allegedly knew it. It is clear from the evidence that Geneve and Menner failed to honor their commitments, and the strong implication from the evidence is that they lied to Mr. Newman and Stage Presence in this respect. In this regard, the evidence shows that Mr. Newman and Stage Presence were the victims of fraud, not the perpetrators of it. There is no evidence that Mr. Newman thought the funding was illusory. Even the plaintiffs' own witnesses testified that they thought that Mr. Newman had merely been mistaken about the financing, and not that he had intentionally deceived them about it.

Plaintiffs cited to an email in which one of the Producers, Mr. Marquette, mentioned that it was important to "show" a television network and potential sponsors that funding was in place. Plaintiffs argued at trial that the use of the word "show" somehow suggested that the loan agreement was intended only to be a sham, and only as something that could be used to misrepresent the status of funding to other parties. After considering all the evidence I reject this interpretation. I find, based on the evidence and my assessment of the credibility of the witnesses, that Mr. Newman actually believed that the funding had been arranged, that Geneve was committed to provide it, that Geneve had the ability to provide it, and that Geneve would provide it.

Plaintiffs contended that additional debts to some of the plaintiffs were incurred several weeks after the benefit concert and in connection with the post-production process, at a time

when there had already been delays in the Geneve funding.   Plaintiffs argued that by this time

Mr. Newman allegedly knew that the funding was a hoax, but I find that is simply not the case.

I find that Mr. Newman continued to believe that the funding would be forthcoming.

Furthermore, it was reasonable to complete the post-production work on the television recording,

because a failure to do so might actually have provided Geneve with an excuse to back out of its

promised loan.

Plaintiffs also argued that Mr. Kelman had not been informed of the funding delays when

the post-production work was authorized, but in fact the testimony at trial showed that Mr.

Kelman was aware of them, and that he approved the post-production work despite the delays in

funding.   Mr. Maketansky also testified that he was aware that there were funding problems at

the time the post-production work was done, and he elected to go forward – not because Mr.

Newman misled him in any way, but because Mr. Maketansky was confident in Mr. Newman's

judgment as to whether the financing was forthcoming.

Plaintiffs argued that Mr. Newman never should have believed Geneve, and that he ought

to have known that certain evidence of financial resources that Geneve provided had been faked.

But in deciding whether Mr. Newman used Stage Presence to accomplish a fraud or injustice the

question is what Mr. Newman actually believed, not what plaintiffs think he should have

believed or might have believed in hindsight.   There is no evidence that Newman actually

believed the funding was questionable or would fail, or that he actually thought that Geneve did

not have the necessary resources.

Finally, plaintiffs contended at trial that the copy of the loan agreement that Geneve

signed in favor of Stage Presence was itself a fake.   They point to a declaration that Mr.

Newman signed in 2010 that attached a copy of a similar loan agreement executed in favor of an

26

entity known as Anguilla Music Production and Publishing ("AMPP") rather than Stage Presence.   They introduced testimony by Mr. Newman during a hearing in another case in the District Court, in 2010, to the effect that the loan agreement was with AMPP and not with Stage Presence.   *See* Pl.'s Ex. 8, H'rg Tr. 24:19-25:20.   Plaintiffs also asked me to take judicial notice of the fact that Geneve moved to dismiss a complaint against it on the ground that the loan agreement had been made in favor of AMPP and not Stage Presence, and that the version of the loan agreement that was executed in favor of Stage Presence was not offered in Court until after that motion was filed.

Mr. Newman testified at trial that the execution of the loan agreement in favor of AMPP in April 2010 had been a mistake, that he had immediately had it re-executed in favor of Stage Presence, and that the Stage Presence loan agreement was in effect at the time of the benefit concert.   I agree with plaintiffs that if this were the case it is very difficult to understand just why the AMPP version of the agreement was attached to Mr. Newman's prior declaration, and why it was referenced in the testimony that he gave in the District Court in October 2010.

But while I am very troubled by those facts, I find based on all of the evidence that the agreement in favor of Stage Presence was in fact executed and was enforceable.   The strongest evidence of this fact is what happened in the litigation against Geneve International Trust.

The original complaint in the action against Geneve International Trust, of which plaintiffs have asked me to take judicial notice, alleged expressly that Geneve had executed a $5 million loan agreement in favor of Stage Presence itself.   *See* Complaint, Adv. Pro. No. 12-01561, Docket No. 1, at ¶ 11.   Defendants moved to dismiss the contract claim on the ground that no copy of a loan agreement had been attached to the complaint.   Geneve also moved to dismiss fraud claims and argued that there was no jurisdiction over Geneve.   Defendants also

27

submitted a declaration by Mr. Bartholomew to the effect that he was not aware of any contract

ever signed by Geneve with any entity.   *See* Decl. of Ronald L. Bartholomew, Adv. Pro. No. 12-

01561, Docket No. 4-11 at ¶ 8.

In connection with the motion to dismiss Geneve submitted copies of a prior declaration

by Mr. Newman in the District Court litigation that attached the AMPP agreement.   Judge

Gropper noted at oral argument that it was not clear if this was the agreement the parties were

relying upon but that in any event the contract claim needed to be repleaded.   Stage Presence

then filed an amended complaint on September 20, 2012 that attached a copy of the loan

agreement that Geneve had executed in favor of Stage Presence.   Geneve then renewed its

motion to dismiss.   Notably, in that motion Geneve did not deny the authenticity of the Stage

Presence agreement that was attached to the amended complaint.   Instead, Geneve argued that

the contract was not enforceable due to an alleged lack of consideration, an alleged lack of

specificity, an alleged disparity in the names of the benefit concerts to be funded, and other

arguments.

When the motion to dismiss was argued before Judge Gropper, Ms. Connolly appeared.

(Ms. Connolly was the attorney for the plaintiffs in the prior District Court litigation and is the

attorney for the plaintiffs in this proceeding.)   Ms. Connolly informed the court that in the

District Court litigation the separate version of the loan agreement, in favor of AMPP, had been

produced.   Judge Gropper asked if there was an explanation, but noted that issues as to the

authenticity of the agreement were not before him at that time.   He then denied the motion to

dismiss.

I cannot emphasize enough that the only person who appeared to contest the authenticity

of the Stage Presence loan agreement at this hearing was Ms. Connolly, who was not a party to

the proceedings.    Geneve itself did not contest the authenticity of the agreement.    Nor did Mr.

Bartholomew, the trustee of Geneve whose signature appears on the document.

Geneve and Bartholomew never did file answers to the amended complaint.    They

defaulted, and then the parties stipulated that the defaults would be vacated and the disputes

would be referred to arbitration.    The uncontradicted testimony at trial was that the defendants

never challenged the validity and authenticity of the Stage Presence agreement during the

arbitration.    Furthermore, plaintiffs offered into evidence a copy of the arbitrator's decision.    In

that decision the arbitrator noted that the defendants had argued that the agreement was merely a

preliminary agreement or was otherwise not sufficiently specific to be enforced, but at no point

in his opinion is there any hint that the defendants (including Mr. Bartholomew himself) ever

denied that the agreement had been signed in favor of Stage Presence.    The arbitrator rejected

the asserted defenses and held that the loan agreement in favor of Stage Presence was valid and

enforceable.

I find based on this evidence that the Stage Presence loan agreement was not a fake and

was not contrived after the fact.    Geneve and Bartholomew certainly had every incentive to

make that argument if the agreement had been faked, but all the evidence that I have suggests

that they never did so.    Instead, the loan agreement was found to be valid and enforceable in the

arbitration action that was pursued, and the person who executed it on behalf of Geneve does not

appear ever to have contested its authenticity.

I find, based on all the evidence, that the Stage Presence version of the loan agreement

did exist, that it was executed in April 2010, that Mr. Newman and Stage Presence proceeded

with the Childhelp concert in reliance on that loan agreement and in the honest belief that

Geneve would honor the agreement.    The fact that Stage Presence could not ultimately collect

sufficient funds from Geneve to pay Stage Presence's debts had to do partly with the fact that

Stage Presence had not sufficiently verified its damages during the arbitration, but far more

importantly with the fact that it could not execute a judgment against Geneve.

## Conclusion

In summary, I find that the evidence did not show any improper domination of Stage

Presence or any fraud, or any intent to deceive, or any actual or intended misuse of Stage

Presence.   Plaintiffs understandably are upset that they have not been paid.   They seem to be

sincere in their belief that Mr. Newman somehow should rectify that situation.   The gist of their

contention seems to be that they think Mr. Newman, as a Producer, has a moral responsibility to

ensure that they are paid.   But plaintiffs knowingly contracted with Stage Presence, not Mr.

Newman.   They asked for no personal guarantees and did not believe Mr. Newman had given

any such personal guarantees.   They may believe it is an injustice if Mr. Newman is not

personally liable for Stage Presence's debts, but that limited liability is the whole reason why

corporations are formed.   It does not work an injustice to enforce that limited liability in a case,

such as here, where the facts at trial do not support the contention that the corporate form should

be disregarded.

An order will be entered, allowing plaintiffs' claims against Stage Presence but

dismissing the alter ego claims against Mr. Newman.   Together with this Court's prior rulings as

to other claims and other defendants this order will finally resolve all claims asserted in the

Music Mix adversary proceeding, and accordingly a final judgment will also be entered.

Dated: New York, New York
      October 26, 2018


                       **s/Michael E. Wiles**
                       UNITED STATES BANKRUPTCY JUDGE